**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

06 JAN 18 PM 3: 40

CLERK-ALBUQUERQUE

EARL CAYADITTO and ETHEL MESCAL, individually, and as natural and legal parents of Ethan Cayaditto, deceased minor child, and BRETT J. OLSEN, Esq., as the Personal Representative of the ESTATE OF ETHAN CAYADITTO, deceased minor child,

        Plaintiffs,

vs.                        No. CIV-04-1261 JC/LFG

UNITED STATES OF AMERICA,

        Defendant.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**COME NOW** the Plaintiffs, Earl Cayaditto and Ethel Mescal, individually, and as natural and legal parents of Ethan Cayaditto, deceased minor child; and Brett J. Olsen, as Personal Representative of the Estate of Ethan Cayaditto, by and through their attorneys of record, Lamb, Metzgar, Lines & Dahl, P.A. (Steven Tal Young, Esq. and Jeffrey A. Dahl, Esq.), and make the following proposed Findings of Fact and Conclusions of Law for consideration by this Court:

### *PROPOSED FINDINGS OF FACT*

1.    Ethan Irwin Cayaditto was born on November 17, 2001, and died on December 20, 2002, when he was just over 13 months old.

2.    Earl Cayaditto and Ethel Mescal are residents of the State of New Mexico, and reside in the County of McKinley.

3.    Mr. Cayaditto and Ms. Mescal are members of the Eastern Navajo Nation. Ethan Cayaditto, deceased, was also a member of the Eastern Navajo Nation, having been listed on the Navajo Indian Census Roll as being four-quarters (4/4) degree Navajo Indian blood.

4.    Plaintiffs lodged timely claim with the Department of Health and the claim was denied. Plaintiffs' Complaint was timely filed after denial of the claim.



5. Defendant operates the Indian Health Service, an agency of the government of the United States of America, and through it, owns and operates Pueblo Pintado Clinic in Pueblo Pintado, New Mexico and Crownpoint Healthcare Facility in Crownpoint, New Mexico.

6. Ethan Cayaditto was born at Presbyterian Hospital in Albuquerque, New Mexico, on November 17, 2001, by C-section. He was born at 30 weeks and was, therefore, premature. Ethan remained at Presbyterian Hospital until December 14, 2001, for a total of 27 days, He was transferred to Gallup Indian Medical Center for additional observation.

7. The Transfer Summary from Presbyterian Healthcare Services diagnosed Ethan as having respiratory distress syndrome, at risk for respiratory syncytial virus, and he was also diagnosed with anemia of prematurity, apnea and bradycardia, and required nutritional support. In addition, other findings were made in relation to his prematurity.

8. Ethan was discharged from Presbyterian with an unlabored respiratory pattern and adequate air exchange, however, was diagnosed and at risk for various conditions as a result of his prematurity.

9. At birth, Ethan had mild to moderate retractions and grunting, decreased air exchange and required $O_2$ therapy. While he initially had some improvement in air exchange, his respiration deterioration progressed. He was intubated, placed on a mechanical ventilator and received surfactant within the first ten (10) days of life.

10. During his stay at Presbyterian, on December 3, 2001, he was diagnosed at risk for respiratory syncytial virus (RSV), secondary to his gestational age. Presbyterian recommended Synagis administration when close to discharge and monthly thereafter during the RSV season. The RSV season is during the winter months, however, differs among regions.

11. Ethan received Synagis through IHS.

12. At Presbyterian, Ethan was diagnosed with apnea and bradycardia and received therapy.

13. The plan for Ethan's well-being by Presbyterian was to continue monitoring for apnea and continue therapy. In addition, Ethan received nutritional support while at Presbyterian.

14. Ethan received respiratory support from birth until November 29, 2001.

15. At birth, Ethan was in the very lowest percentiles for length, weight and head circumference, as established by the American Academy of Pediatrics. However, in November of 2002, Ethan had developed to the point that he was in the 25th percentile for length, almost the 75th percentile for weight, and approximately the 80th percentile for head circumference.

16. Despite his prematurity, there is no indication that Ethan could not have recovered from his prematurity and live a normal, healthy life.

17. At the time of transfer to Gallup Indian Medical Center on 12/14/01, Ethan weighed 1.720 kilograms. Ethan remained at Gallup for approximately one (1) week.

18. Ethan's family sought medical attention for Ethan on many occasions throughout his life for respiratory issues, coughing, trouble breathing and wheezing, all related to his respiratory condition.

19. Ethan was formally admitted to Crownpoint Hospital on only three (3) occasions: 1) May 12, 2002 to May 14, 2002; 2) December 4, 2002 to December 6, 2002; and 3) December 17, 2002 to December 19, 2002. On all admissions Ethan had respiratory issues including respiratory distress and bronchiolitis. On each of these admissions, Ethan was discharged in approximately 48 hours, which comports with the IHS physicians' and staff's discharge plan.

20. Ethan was discharged on 12/19/02 from Crownpoint. Upon discharge, the M.D., Dr. Donald Kulas, on the day of discharge, indicated that the X-ray findings show no evidence of pneumonia, "but there are inflammatory changes" consistent with the viral process, but that the degree of irritability is difficult to explain, "but that a viable process (i.e., RSV)" seems most likely. He also indicated as a plan that Ethan was to be discharged to home with a followup in three to four days. *Dr. Kulas indicated that the family should return to clinic for any worsening of symptoms,*

especially fever, irritability, rash, etc. Dr. Kulas ordered that the patient should continue albuterol via nebulization.

21. Despite Ethan's history of bronchiolitis associated with RSV and respiratory illness, and four separate chest X-rays which showed bronchiolitis, Dr. Kulas did not know the nature of Ethan's illness when he discharged him on 12/19/02.

22. Ethan had tested positive for RSV upon admission to the hospital on 12/17/02.

23. On 12/17/02, Ethan was set up for a short stay. Dr. Kulas admitted Ethan and Dr. Hurlbutt was the reporting physician. Despite Ethan's history of prematurity, having tested positive for RSV, his prior treatment for respiratory distress, X-ray findings consistent with bronchiolitis, the diagnosis did not include bronchiolitis. Dr. Kulas had a discharge plan which included discharging Ethan at 48 hours from admission without knowing the diagnosis, stating that it was too early to say.

24. Ethan was discharged on 12/19/02, approximately 48 hours from his admission on 12/17/02. Ethan's family was informed that Ethan was fine and he was ready to go home which mirrored what the family had been told each time they sought medical attention for Ethan. At the time of discharge on 12/19/02, Ethan was discharged because the hospital needed the bed for other patients.

25. Ethan's mother was consistently instructed to return to Pueblo Pintado Clinic for worsening symptoms upon being sent home. Instead, Ethan's mother was instructed to return to Pueblo Pintado Clinic if Ethan's cough got worse or any trouble breathing or any concerns upon discharge on 12/19/02. Upon discharge, despite Dr. Kulas' instructions that Ethan was to continue albuterol via nebulization, Ethan's mother was given an MDI (multi-dose inhaler) with a spacer.

26. Ethan had never shown improvement in his breathing, oxygen saturation levels or overall condition through the use of an MDI. The physicians and nursing staff had never used an MDI in the treatment of Ethan and, therefore, were not in a position to gauge the effectiveness in light of Ethan's condition.

4

27. Ethan had shown some improvement through the use of albuterol via nebulization and this was prescribed for home use upon discharge on 12/19/02 in light of the fact that it had shown to improve his condition. Ethan's family was never given a nebulizer machine to administer albuterol via nebulization upon discharge 12/19/02, contrary to Dr. Kulas' note.

28. MDI, with or without a spacer, was not an effective method for delivering albuterol to Ethan. Nebulization was an effective method for delivering albuterol to Ethan.

29. At the time of discharge on 12/19/02, Ethan had difficulty breathing and there were coarse breath sounds in his lungs.

30. At the time of discharge on 12/19/02, the area was experiencing snow flurries. The Mescal residence, where Ethan was discharged to, is approximately 35 miles from Crownpoint Hospital. At the time of Ethan's discharge on 12/19/02, the physicians and staff at Crownpoint who were responsible for discharging Ethan knew that the location Ethan was being discharged to did not have utilities, including running water or electricity.

31. Ethan and his parents and family placed their trust and confidence in the physicians and staff at IHS facilities at Pueblo Pintado and Crownpoint and believed that the physicians and staff would adequately consider their medical needs and appropriately treat Ethan's condition.

32. The staff assigned to Pueblo Pintado Clinic on 12/20/02 was not equipped or capable of responding to the emergency nature of Ethan's condition on 12/20/02.

33. Ethan's condition remained the same the evening of 12/19/02 through the morning of 12/20/02. Ethan continued to have a bad cough and fever at the time of discharge and continued to cough and had a fever all night long on December 19, 2002 through mid-morning on December 20, 2002.

34. Ethan's mother drove Ethan to Pueblo Pintado Clinic, which is approximately 20 minutes in the opposite direction of Crownpoint Healthcare Facility. Upon arrival at the clinic, it was closed.

35. Construction workers who were working at the site, attempted cardiopulmonary resuscitation at Pueblo Pintado Clinic.

36. IHS did not have a physician scheduled at the clinic on December 20, 2002. The staff that was scheduled to arrive was late.

37. The ambulance that was dispatched from Crownpoint went to the wrong location before returning to the clinic, thereby causing delay in the assessment and treatment of Ethan's condition, including attempts to resuscitate.

38. Ethan was pronounced dead at 1:47 p.m., on December 20, 2002.

39. Ethan died of acute bronchiolitis/bronchitis which was caused by RSV. Bronchiolitis is a common condition in infants and children and occurs most commonly in the winter months. RSV is the most common cause of bronchiolitis.

40. A microscopic examination of Ethan's tissues revealed a severe bronchiolitis with bronchitis. His hospitalization course and the clinical history prior to his death are consistent with this condition. Ethan's previous history of prematurity and two previous hospitalizations for bronchiolitis, imply he may have been more susceptible to severe complications with RSV infection. The autopsy report confirms these findings.

41. Bronchiolitis is a common condition in infants and children under the age of two years, and occurs most commonly in the winter months. RSV is the most common cause of bronchiolitis, but other viral infections may also cause this illness. RSV-induced bronchiolitis is much more severe in children with underlying heart and lung conditions, including children with cystic fibrosis, broncho-pulmonary dysplasia due to prematurity and in children with reactive airway disease (an early form of asthma). Bronchiolitis causes wheezing, coughing, shortness of breath, rapid breathing, and can lead to respiratory failure. The autopsy report confirms these findings.

42. An autopsy revealed that within the living tissue, there was severe chronic inflammation of the bronchi and bronchioles. The thymus had a degree of involution consistent with

prolonged, severe physiologic stress. The findings were consistent with severe bronchitis and bronchiolitis, over a prolonged period of time. Additional findings included mild acute hepatitis of unknown cause. The autopsy report confirms these findings.

43. Proper assessment and evaluation of Ethan's condition throughout his life and upon discharge on 12/19/02, would have revealed that his condition was severe. It was not appropriate to discharge Ethan, given his condition on 12/19/02, and with appropriate medical intervention, observation and medical care, Ethan had a 100% chance of surviving.

## *CONCLUSIONS OF LAW*

1. Defendant, its agents, agencies and employees, breached their duty of care and were negligent in failing to appropriately diagnose, assess, evaluate and treat Ethan's medical condition throughout his life. Appropriate and timely intervention through proper evaluation, diagnosis, care and treatment throughout his life would have prevented Ethan's death.

2. Defendant, its agents, agencies and employees, breached their duty of care and were negligent in failing to properly diagnose and manage Ethan's medical condition throughout his life.

3. Defendant, its agents, agencies and employees, breached their duty of care and were negligent in failing to establish appropriate protocols in the management and assessment of infants presenting with Ethan's symptoms and bronchiolitis/bronchitis.

4. Defendant, its agents, agencies and employees, breached their duty of care and were negligent in failing to properly diagnose and manage Ethan's medical condition on December 17, 2002 through December 20, 2002.

5. Defendant and its employees' conduct dropped below the applicable standard of medical care required, applicable standard of care in the community and Defendant and its employees committed medical malpractice by failing to apply the knowledge, skill and care used by reasonably well-qualified providers. Defendant and its employees committed medical malpractice throughout Ethan's life which resulted in the wrongful death of Ethan Irwin Cayaditto on December 20, 2002.

6. Defendant, its agents, agencies and employees, breached their duty of care and were negligent in failing to properly evaluate, assess, diagnose and manage Ethan's medical condition at all times in which he was in their care, up to and including the date of his death on December 20, 2002.

7. Defendant, its agents, agencies and employees' conduct in the evaluation, assessment, diagnosis and care of Ethan fell below the applicable standard of care in the community and Defendant committed malpractice by failing to apply the knowledge, skill and care ordinarily used by reasonably well-qualified providers.

8. Defendant, its agents, agencies and employees, by their conduct, are solely, completely and proximately responsible for Ethan's death and his death could have and would have been avoided in the absence of Defendant's malpractice and medical negligence.

9. Defendant, its agents, agencies and employees, breached their duty of care and were negligent in failing to establish appropriate protocols in the management and assessment of infants presenting with Ethan's symptoms and in the treatment of bronchiolitis/bronchitis.

10. Defendant, its agents, agencies and employees, were negligent in their care of Ethan in the following respects:

   a. Failing to recognize throughout his life that Ethan's clinical presentation required appropriate testing, evaluation, assessment, monitoring and care.

   b. Throughout his life, failing to provide Ethan the appropriate testing, evaluation, assessment, monitoring and care.

   c. Failing to recognize that Ethan's clinical presentation was consistent with RSV, which could and did lead to bronchiolitis/bronchitis.

   d. Failing to conduct appropriate testing to determine whether Ethan was suffering from RSV.

  e. Failing to recognize that Ethan should have been kept in the hospital for observation and care in the event of breathing difficulties and further complications.

  f. Failing to recognize that Ethan should not have been discharged on December 19, 2002, to a location approximately 35 miles from the facility.

  g. Failing to recognize that the clinic to which Ethan was referred, namely Pueblo Pintado Clinic, was not equipped to assess and treat his condition in the event of further complications.

  h. Failing to recognize that the clinic to which Ethan was referred, namely Pueblo Pintado Clinic, would not be open at a critical period of time in the event Ethan experienced further complications the morning following discharge.

  i. Failing to recognize that the hours of operation of the clinic and the time of arrival of medical staff were critical to Ethan in light of his condition and the distance Ethan would have to travel to return to Crownpoint.

  j. Failing to properly staff the Pueblo Pintado Clinic at a time that was critical in relation to the instruction that he be taken to the Clinic in the event that his condition worsened.

  k. Failing to recognize that Ethan's clinical presentation was consistent with RSV.

  l. Discharging Ethan with inadequate medication and instructions when his medical condition required that he receive further treatment and observation to save his life.

  11. Plaintiffs are entitled to money judgment for wrongful death as a result of medical negligence, including funeral expenses, loss of past, present and future earnings, emotional distress, pain and suffering, loss of consortium, loss of enjoyment of life and a monetary award in an amount reasonably necessary to compensate them and the Estate of Ethan Cayaditto, for injuries and damages, plus pre- and post-judgment interest and costs.

  12. The occurrence section of the Medical Malpractice Act is unconstitutional to the extent it limits recovery in an amount that exceeds the applicable cap for multiple occurrences of

malpractice and multiple tortfeasors. The cap established by the Medical Malpractice Act does not limit Plaintiffs' recovery to the extent it exceeds the cap since Defendant's actions constitutes multiple occurrences of malpractice throughout Ethan's life and up to and including his death on December 20, 2002 and Defendant's multiple providers each committed separate acts of malpractice and, therefore, subjecting Defendant to multiple caps of recovery.

Respectfully submitted,

**LAMB, METZGAR, LINES & DAHL, P.A.**

By: _____
STEVEN TAL YOUNG
JEFFREY A. DAHL
Attorneys for Plaintiffs
P.O. Box 987
Albuquerque, NM 87103
(505) 247-0100 telephone
(505) 247-9249 facsimile

I hereby certify that a true and correct copy of the foregoing was mailed to opposing counsel on this 18th day of January, 2006.

_____
STEVEN TAL YOUNG
c:\myfiles\sty\Cayaditto\of & col.wpd

10