**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

EARL CAYADITTO and ETHEL MESCAL, individually,
and as natural and legal parents of Ethan Cayaditto, deceased
minor child, and BRETT J. OLSEN, Esq., as the Personal
Representative of the ESTATE OF ETHAN CAYADITTO,
deceased minor child,

        Plaintiffs,

vs.                                                     No. CIV-04-1261 JC/LFG

UNITED STATES OF AMERICA,

        Defendant.

**PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

      **COME NOW** the Plaintiffs, Earl Cayaditto and Ethel Mescal, individually, and as natural and legal parents of Ethan Cayaditto, deceased minor child; and Brett J. Olsen, as Personal Representative of the Estate of Ethan Cayaditto, by and through their attorneys of record, Lamb, Metzgar, Lines & Dahl, P.A. (Steven Tal Young, Esq. and Jeffrey A. Dahl, Esq.), and pursuant to the Court's directive, hereby submits the following supplemental proposed Findings of Fact and Conclusions of Law for consideration by this Court in addition to those proposed on January 18, 2006:

*PROPOSED FINDINGS OF FACT*

      44.     The single-wide trailer at the location Ethan was discharged to on December 19, 2002, had no electricity or utilities of any kind, no plumbing and no running water.

      45.     Ethan's family had attempted to obtain electrical service to the singe-wide trailer in White Horse Lake where Ethan lived with his family.  The family was denied electric service.

      46.     The only source of heat at the single-wide trailer on December 19-20, 2002, was a small wood-burning stove in the living room with a stove pipe extending through the ceiling.  It was cold during this time frame which required Ethel Mescal and her four children, including Ethan, to sleep in the living room on the night of December 19, 2002.

47.     Ethan tested positive for Respiratory Syncytial Virus (RSV) during the December 4-6, 2002, admission and during the December 17-19, 2002 admission.

48.     Ethan had RSV at all times in December 2002.

49.     RSV is viral in nature and can result in rapidly deteriorating condition and, ultimately, death in children.  Though RSV can present as relatively benign, rapidly deteriorating conditions can result in death in as little as a couple of hours.  RSV-induced Bronchiolitis can result in severe inflammation of the distal bronchial tree which causes decreased oxygen saturation and total respiratory failure followed by cardiac arrest.  Ethan died as a result of RSV-induced Bronchiolitis.

50.     When balancing the medical probabilities, it was foreseeable that Ethan's condition would deteriorate subsequent to discharge on December 19, 2002.

51.     Ethan's condition on December 19, 2002 at discharge from Crownpoint Hospital was not stable.  His oxygen saturation levels fluctuated and were low; he had an increased respiratory rate and was continuing to have shortness of breath and coughing.  These are clinical features consistent with RSV Bronchiolitis.  The clinical features, coupled with Ethan's history of prematurity, 14 visits for multiple respiratory illness throughout his life, and the fact that rhonchi were heard upon discharge, indicates that he was not stable at the time of discharge.

52.     Ethan's discharge on December 19, 2002, was premature in that he was not ready to go home.  The environment Ethan was discharged to on December 19, 2002, lacked access to prompt, immediate and capable medical care.

53.     Ethan had shown marginal improvement in his breathing through the use of Albuterol via Nebulization.  Ethan had not shown improvement through the use of Albuterol via Multi-Dose Inhaler (MDI).  Neither Albuterol via Nebulization nor Albuterol via MDI were effective rescue medications in light of Ethan's condition.

54.     Ethan received Albuterol via Nebulization during his hospital stay December 17-19, 2002.

2

55.     Ethan's condition at discharge on December 19, 2002, remained the same until December 20, 2002.  Ethan's breathing did not improve through the use of the MDI after discharge on December 19, 2002 up through the time of respiratory failure and cardiac arrest.

56.     Ethan's respiratory failure occurred in the remote location he had been discharged to. Unfortunately, Ethan's respiratory demise occurred far from skilled medical personnel and, by the time he was adequately treated, he was unable to be resuscitated.

57.     Ethan had Reactive Airway Disease (RAD) and Chronic Lung Disease.  RAD is a component to RSV-induced Bronchiolitis.

58.     Had Ethan been in the hospital at the time he suffered respiratory distress on December 20, 2002, he would have lived.

59.     Ethan's chronic lung processes, including Chronic Lung Disease, Reactive Airway Disease and his under-developed respiratory system as a result of his prematurity, rendered him more susceptible to respiratory illness, including RSV-induced Bronchiolitis.

60.     RAD and RSV/Bronchiolitis increases in frequency and becomes more severe with each occurrence.  Ethan was more susceptible to severe, multiple occurrences of RSV-induced Bronchiolitis such that, when balancing the possibilities, there was a likelihood that he would suffer respiratory distress, followed by cardiac arrest and death.

61.     Ethel Mescal provides excellent care for her children and provided competent, excellent care for Ethan Cayaditto.  In every instance, she exercised caution and good judgment following Ethan's discharge on December 19, 2002.

62.     Ethan's caregivers, after discharge on December 19, 2002 until his death on December 20, 2002, did not have access to a working phone.

63.     MDI with a face mask could not have the same effectiveness in treating Ethan's condition as Nebulized Albuterol.

64.     Dr. Kulas' orders on December 19, 2002 were that Ethan be discharged with Albuterol via Nebulization that was to continue.  After this note, Ethan's condition deteriorated such

that coarse breath sounds (Rhonchi) remained in his lungs.  However, Ethan was discharged and the family was instructed to use a treatment that was ineffective (i.e., MDI).

65.     IHS Facilities at Crownpoint, New Mexico and Pueblo Pintado Clinic, at Pueblo Pintado, New Mexico are located within the exterior boundaries of tribal lands.

66.     Defendant has undertaken the responsibility of providing the primary emergency medical care to the members of the Eastern Navajo Nation.

67.     Crownpoint Hospital and Pueblo Pintado Clinic provide, for all practical purposes, the only western medical care most Navajo tribal members receive.

68.     On many occasions, including December 19, 2002, Ethel Mescal was informed upon discharge that Ethan was ready to go home, would be fine and that there was every expectation that Ethan would only get better.  This, coupled with prescription of the MDI, created a false sense of security in Ethan's mother.

69.     Ethan was discharged from the Crownpoint Hospital on December 19, 2002, to make room for other patients that were anticipated at Crownpoint Hospital.

70.     Ethan was pronounced dead at 1:47 p.m. on December 20, 2002, at Crownpoint Hospital.

71.     Defendants did not provide appropriate training and instructions for the staff at Pueblo Pintado Clinic on December 20, 2002.

72.     The Pueblo Pintado Clinic had limited hours on December 20, 2002, the date of Ethan's death, and would not be open for the weekend.  Ethan's followup appointment was scheduled for December 23, 2002, at Pueblo Pintado Clinic.

### *CONCLUSIONS OF LAW*

13.     The United States government has, by virtue of its own affirmative acts, arranged to provide medical and emergency services to the Eastern Navajo Nation.  *Cheromiah v. United States*, 55 F.Supp.2d 1295 (D.N.M. 1999).  The arrangement to provide such service is performed on and within tribal lands and directly impacts on the health and safety of tribal members.  *Montana v.*

*United States*, 450 U.S. 544, 565-66, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Strate v. A-1 Contractors*, 520 U.S. 438, 457, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).

14.     The medical malpractice at Crownpoint Hospital and Pueblo Pintado Clinic had a direct and substantial impact on the health and welfare of the Navajo tribe, including Ethan and his family. *Montana v. United States*, 450 U.S. 544, 555, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

15.     Defendant providers, Dr. Kulas and Dr. Hurlbutt committed separate acts of negligence and malpractice and there were separate occurrences of malpractice in their care and treatment of Ethan Cayaditto.

16.     Defendant is responsible for the negligence in the care and treatment of Ethan Cayaditto committed by physicians and staff at Crownpoint Hospital and Pueblo Pintado Clinic and such activities were within the scope of their employment.

17.     The negligence of Defendant physicians, Dr. Kulas and Dr. Hurlbutt was successive and amounts to separate occurrences of malpractice.

18.     Defendant, by and through its providers, proximately caused the wrongful death of Ethan Cayaditto.

Respectfully submitted,

**LAMB, METZGAR, LINES & DAHL, P.A.**

By: *s/filed electronically on 01/30/06*
      **STEVEN TAL YOUNG**
      **JEFFREY A. DAHL**
      Attorneys for Plaintiffs
      P.O. Box 987
      Albuquerque, NM  87103
      (505) 247-0100 telephone
      (505) 247-9249 facsimile

I hereby certify that a true and correct copy of the foregoing was mailed to opposing counsel on this __30th__ day of January, 2006.

*s/filed electronically on 01/30/06*
**STEVEN TAL YOUNG**
c:\myfiles\sty\Cayaditto\fof & col-supp.wpd