IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

EARL CAYADITTO and ETHEL MESCAL,
individually, and as natural and legal parents
of Ethan Cayaditto, deceased minor child, and
BRETT J. OLSEN, Esq., as the Personal
Representative of the ESTATE OF ETHAN
CAYADITTO, deceased minor child,

       Plaintiffs,

vs.                                           No. CIV 04-1261 JC/LFG

THE UNITED STATES OF AMERICA,

       Defendant.

**COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    The parties have stipulated to several findings of fact and conclusions of law. The Court adopts that stipulation which was filed on January 18, 2006 (Doc. #107).

**FINDINGS OF FACT**

    1. Ethan Cayaditto suffered from respiratory disease from the time of his premature birth. He was taken to the Crownpoint Hospital and Pueblo Pintado Clinic for treatment for respiratory problems approximately twelve to fourteen times during his life. He was hospitalized at the Crownpoint Hospital three times, and the last two in December are the ones with the most bearing on this case.

    2. He was admitted to the Crownpoint Hospital on December 4, 2002 and discharged on December 6, 2002. He continued to improve while in the hospital, and upon discharge was told to return immediately to the hospital if any additional problems occurred such as high fever or increased respiratory rate, vomiting, diarrhea or if Ethel Mescal, his mother, had any other

concerns. The discharge was authorized by Donald Kulas, M.D. who is board certified in pediatrics.

3. Ethan's third hospitalization was from December 17, 2002 until December 19, 2002. He continued to improve and was discharged at approximately 9:30 a.m. on December 19, 2002 by Tanya Hurlbutt, M.D., a board certified pediatrician. Throughout his hospitalization, Ethan was breathing without supplemental oxygen. His $O_z$ rate at discharge was 95% or above, which is normal.

4. The plaintiff, Ethel Mescal, and her children, including Ethan Cayaditto, lived in horrible conditions on the Navajo Nation. They lived in a mobile home which had no utilities whatsoever. Dr. David Josephs, Ethan Cayaditto's primary care physician, had visited the home in the past and was familiar with the facilities and the distance from Crownpoint to the home itself.

5. None of Ethan Cayaditto's physicians, including Dr. Kulas, Dr. Hurlbutt or Dr. Josephs expected or anticipated that Ethan Cayaditto would need emergency treatment after his discharge from the Crownpoint Hospital on December 19th. Had that been anticipated, he would not have been discharged. The doctors all thought that Ms. Mescal was a competent parent and that she would follow their oral instructions to return to Crownpoint Hospital if any worsening of symptoms occurred.

6. On the evening of the 19th, Ethan was taken to the home of his father in Pueblo Pintado. His father lived in a mobile home that had utilities, but it appears no one suggested that Ethan spend the night at his father's mobile home.

7. After Ethan returned to Whitehorse Lake with his mother on the night of December 19th, his condition seemed to be deteriorating.

8.  His sister, Marina Sandoval, administered Albuterol medication via the MDI with a spacer which had been ordered by Dr. Kulas, and Ethan went to sleep in the early morning of December 20, 2002.

9.  Ms. Mescal left the trailer at Whitehorse Lake with Ethan at approximately 7:15 a.m. on December 20th and drove thirteen miles to Pueblo Pintado Clinic to wait for the clinic to open at 1:00 p.m., or as soon as a provider arrived.  It was known to Ms. Mescal that the Clinic did not open until 1:00.

10.  The exact location of Ms. Mescal is not known from about 7:15 a.m. until approximately 11:30 a.m.  She did not go to the hospital at Crownpoint.

11.  She returned to her home at approximately 11:00 a.m., and her daughter, Marina Sandoval, went with her to the Clinic at Pueblo Pintado.  Ethan stopped breathing on the way to the Clinic.

12.  When they arrived at the Clinic, no medical personnel had yet arrived, and some construction workers attempted to resuscitate Ethan.  This was unsuccessful, and an ambulance was called.

13.  The ambulance went to the school in Pueblo Pintado rather than the Clinic, and it took more time than necessary for the ambulance to finally arrive at the Clinic.  However, I do not find that to be of great consequence, as Ethan had already stopped breathing.

14.  Ethan was placed in the ambulance which headed for Crownpoint Hospital.  Crownpoint sent out an ambulance to meet them and a rendezvous occurred approximately halfway between Crownpoint and Pueblo Pintado, but Ethan was not able to be resuscitated.  He was pronounced dead at 1:47 p.m. on December 20, 2002.  The EMT interviewed both Ms. Mescal and her daughter, Marina Sandoval, after they arrived at Crownpoint.  The EMT testified

that both Ms. Mescal and her daughter told her that Ms. Mescal had taken Ethan to a medicine man that morning.  Marina Sandoval, on rebuttal, testified that she had not said that.   However, I find that the EMT had no reason whatsoever to have made up that story; therefore, I believe that the unaccounted for time that morning was when Ms. Mescal took Ethan to a medicine man.

15.  Dr. Hurlbutt testified that had Ethan been brought to the hospital on the morning of December 20th, he could have been saved.

16.  Dr. Robert Henry, an emergency room doctor at Presbyterian Hospital in Albuquerque, testified that the defendant's acts fell below the applicable standard of care in the community, and that defendant's doctors committed malpractice by failing to apply the knowledge, skill and care ordinarily used by qualified providers.   Dr. Henry never treated Ethan.  I believe he had been an ER physician for approximately 30 years but is not board certified because he did not pass his boards.

17.  The testimony of the three treating physicians, Dr. Josephs, Dr. Kulas and Dr. Hurlbutt was to the contrary.

18.  Dr. Gary D. Overturf, a Professor of Pediatrics and Pathology and Director of Pediatric Infectious Diseases at the University of New Mexico Hospital states,

> This can be concluded that the care given to Ethan on the hospital admissions on December 4th-5th, 2002 and December 17th-20th, 2002 were entirely within or exceeded the standard of care for children with RSV bronchiolitis.  Also the diagnosis of RSV bronchiolitis was validated by appropriate laboratory testing.  The mortality suffered by Ethan on December 20, 2002 was neither predictable nor avoidable, and due care and concern were given by his physicians at the time of his discharge on December 19, 2002.  The failure of his response to competent resuscitation efforts was predictable since it would appear that the infant was essentially dead on arrival to the Pueblo Pintado Clinic.

19. Dr. Overturf is board certified in his specialty.

20. Dr. Mark R. Crowley, a board certified pediatric critical care specialist, who had practiced pediatric intensive care since 1990 examined the records and stated as follows:

> As stated above, the medical care provided by Drs. Hurlbutt and Kulas appears appropriate and consistent with standard of care. Unfortunately this child had an acute deterioration that could not be anticipated the day before in the hospital. The resuscitation by paramedics and nurse practitioner and Drs. Hurlbutt and Kulas appeared appropriate given the difficult conditions and the period of time which had elapsed prior to the resuscitation starting.

## **CONCLUSIONS OF LAW**

1. The substantive law governing this case is FTCA, 28 U.S.C. Section 1346(b), 2671 et seq., and the applicable law of the State of New Mexico, including the Medical Malpractice Act Section 41-5-1 et seq. NMSA 1978.

2. In accordance with the language of 28 U.S.C. Section 1346(b) of the FTCA, the United States' liability is to be determined by the application of the law of the place where the act or omission occurred.

3. At all times during the care and treatment of Ethan Cayaditto, the medical personnel employed by the Crownpoint Comprehensive Health Care Facility were under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified medical personnel practicing under similar circumstances giving due consideration to the locality involved.

4. There was no deviation from the standard of care, nor were employees of the United States negligent any time when Ethan Cayaditto was seen and treated at Crownpoint whether in the Emergency Room, Clinic, inpatient ward or at Pueblo Pintado Clinic.

5. The elements required to establish negligence in a medical malpractice action are duty, breach, causation and harm. *Alberts v. Schultz*, 975 P.2d 1279, 1283, 126 N.M. 807 (1999).

6. The plaintiffs bear the burden of proving each of these elements.

7. At all times relevant to the Complaint and at all times Ethan Cayaditto was evaluated and treated by the employees of defendant, these employees did not breach any duty to Ethan Cayaditto. At all times, they met the standard of care for all instances of evaluation and treatment of Ethan Cayaditto.

8. Neither a hospital or its employees can guarantee a good medical result. The death of Ethan Cayaditto is not, in itself, evidence of any wrongdoing by defendant. Instead, plaintiffs must prove that the death was caused by defendant's negligence.

9. Judgment will be entered in this case in favor of defendant United States of America.

DATED February 7, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE